# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISON

**HILARY AKIN JACOBS**

**PHILIP MATTHEW JACOBS**

**and**

**MICHAEL WEAVER**

    **Plaintiffs,**

        **v.**

**CHUCK CATLIN**

Serve on: Douglas County Sheriff's Office
       8470 Earl D. Lee Blvd
       Douglasville, GA 30134

**MYRLENE JEAN**

Serve on: Douglas County Sheriff's Office
       8470 Earl D. Lee Blvd
       Douglasville, GA 30134

**MELINDA WRIGHT**

Serve on: Douglas County Sheriff's Office
       8470 Earl D. Lee Blvd
       Douglasville, GA 30134

**SHERIFF MATT GRAY**

Serve on: Douglas County Sheriff's Office
       8470 Earl D. Lee Blvd
       Douglasville, GA 30134

**DOUGLAS COUNTY SHERIFF'S OFFICE**

Serve on: Douglas County Sheriff's Office
          8470 Earl D. Lee Blvd
          Douglasville, GA 30134

**DOUGLAS COUNTY, GEORGIA**

Serve on: 8700 Hospital Drive
          Douglasville, GA
          30134

**JANE DOE**

**JOHN DOES 1-8**

     **Defendants**

## COMPLAINT

     Plaintiffs Hilary Akin Jacobs, Philip Matthew Jacobs, and Michael Weaver (hereafter referred to together as "plaintiffs"), for their complaint against the defendants identified in the caption above, allege as follows.

## INTRODUCTION

     1.  The plaintiffs in this case exercised their First Amendment right to distribute flyers of a political nature.  Many persons, no doubt, would find these flyers offensive, although the flyers do not advocate violence. Such offended people under our basic First Amendment precepts and traditions would have ordinarily been expected to exercise their own free speech rights to disregard the flyers by simply throwing them away. The defendants in this case, however, contrived a radically different tactic, one that flagrantly violated the plaintiffs' First Amendment rights and intentionally placed them into a kind of legal limbo:  namely, they arranged that warrants were issued against the plaintiffs charging them with multiple counts of "littering," served the warrants

in a "shock and awe" manner on Philip and Hilary Jacobs (Mr. Weaver has never been served), and then arranged for the prosecution of the charges to be suspended. Accordingly, no accusation -- a step required under Georgia criminal procedure to open a criminal case - was ever filed and no case has ever been opened in which the plaintiffs could challenge the manifestly unconstitutional warrants, arrests, and threatened prosecutions.

2. More specifically, in November 2023 multiple warrants for misdemeanor "littering" were issued against Philip and Hilary Jacobs, and on the morning of November 3, 2023 approximately nine armed law enforcement officers surrounded the Jacobs' residence in Douglas County, with guns drawn aggressively served the warrants, arrested Mr. Jacobs while he was still in his underwear, arrested Mrs. Jacobs as well, and then took Mr. and Mrs. Jacobs away to the Douglas County Jail. The Jacobs were then incarcerated for several days before a bond hearing was held. At that hearing, bond was set at $30,000 for each of them  -- a total of $60,000 for "littering"  -- requiring the Jacobs, who are not affluent, to pay an out-of-pocket, nonrefundable fee of $4000 to a commercial bonding agency in order to be released from incarceration. Since that date no steps have been taken to prosecute the bogus charges against the Jacobs. This inchoate prosecution, by design, simply hangs over the Jacobs with the purpose of intimidating them from ever distributing flyers again.

3. As for Michael Weaver, he has never been served with any warrants. Law enforcement personnel, however, proceeded to the apartment where he formerly lived clearly indicating they had a warrant for his arrest. Moreover, his father, while driving an automobile registered in Michael Weaver's name, has been pulled over multiple times by law enforcement personnel who informed that gentleman that there was a warrant issued for Michael Weaver's arrest. Mr. Weaver has to this very day not been in a financial position to pay the $30,000 bail that was set for each

of the Jacobs and would undoubtedly be imposed on him. Moreover, defendant Philip Jacobs was physically assaulted while in custody after his arrest (as alleged later in this complaint) and plaintiff Weaver has every reason to expect similar or even harsher treatment if he were to be arrested and confined on the defendants' spurious littering charges. Mr. Weaver's arrest, accordingly, would result in his indefinite and perilous incarceration based on bad faith, unconstitutional charges of "littering," an outrageous consequence of his exercise of his First Amendment right to distribute political flyers. Understandably, these circumstances have forced Mr. Weaver into reclusion, at great cost to his family and social relationships, his emotional health, and his ability to make a living.

4.   As the United States Supreme Court stated in *Terminello v. City of Chicago*, 337 U.S. 1, 4-5 (1949):

> [A] function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger. Speech is often provocative and challenging. It may strike at prejudices and preconceptions and have profound unsettling effects as it presses for acceptance of an idea. That is why freedom of speech, though not absolute . . . is nevertheless protected against censorship or punishment, unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest . . . . There is no room under our Constitution for a more restrictive view. For the alternative would lead to standardization of ideas either by legislatures, courts, or dominant political or community groups.

5.   In *Terminello* and a host of other cases, the Supreme Court has steadfastly upheld the principle that state actors' proper role with respect to unpopular speech is to protect rather than to suppress it, provided the disputed expression is otherwise lawful. Indisputably, the message in the pamphlets at issue in this case was and is lawful. For that reason the defendants' conduct clearly violated and indeed made a mockery of foundational and broadly understood precepts of the First Amendment and the rule of law. Indeed it presents the alarming and dispiriting spectacle of a host

of government actors working together to intimidate the plaintiffs from engaging in their elemental right to freedom of expression concerning public affairs of great urgency and importance.

6. Section 1983 (42 U.S.C. § 1983), which plaintiffs invoke in this complaint along with relevant common law causes of action, was created to vindicate plaintiffs' constitutional rights precisely in circumstances of this kind. Section 1983 and plaintiffs' other claims should be allowed to work their salutary power to redress the defendants' overweening and unconstitutional actions.

## JURISDICTION AND VENUE

7. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, and 1367.

8. Venue is proper in this Court pursuant to § 1391(b) because the events giving rise to plaintiffs' claims occurred in Douglas County, a unit of local government within Georgia.

## PARTIES

9. Plaintiff Philip Matthew Jacobs during the time of the events described in this complaint was a resident of Harelson County, Georgia. As a result of defendants' unconstitutional and tortious conduct toward him and his wife Hilary Akin Jacobs, they have both left Georgia and are now living in Arkansas. Prior to defendants' attacks on his constitutional rights, Mr. Weaver was a print machine operator. He has not been able to practice his trade since the defendants' unconstitutional arrests of him and his wife.

10. Plaintiff Hilary Akin Jacobs during the time of the events described in this complaint was also a resident of Harelson County, Georgia.

11. Plaintiff Michael Weaver during the time of the events described in this complaint was a resident of Cartersville in Bartow County, Georgia. As a result of defendants'

unconstitutional and tortious conduct toward him, he has changed his residence, been forced into reclusion, and been prevented from conducting his vocation as a personal trainer (for physical fitness) and from even working as a manual laborer.

12.    Defendant Myrlene Jean on information and belief was and remains an employee of the Douglas County Sheriff's Office in the position of investigator. Myrlene Jean executed numerous affidavits, including those numbered 23MJD03977 and 23MJD03973, in which she falsely stated that Hilary and / or Philip Jacobs committed the offense of littering in Douglas County, Georgia.  Myrlene Jean's affidavits were used as a basis for the issuance of warrants against Mr. and Mrs. Jacobs that led to their unconstitutional arrest, incarceration, and requirement to post bail.

13.    Defendant Chuck Catlin on information and belief was and remains an employee of the Douglas County Sheriff's Office in the position of lieutenant.  Mr. Catlin executed numerous affidavits, including one numbered 23MSC01233, in which he falsely stated that Hilary and / or Philip Jacobs committed the offense of littering in Douglas County.  Mr. Catlin's affidavits were used as a basis for the issuance of warrants against Mr. and Mrs. Jacobs that led to their unconstitutional arrest, incarceration, and requirement to post bail.

14.    Defendant Melinda Wright on information and belief was and remains an employee of the Douglas County Sheriff's Office.  She is identified in the warrants as the "prosecuting officer."

15.    Defendant Jane Doe is the female employee of Douglas County, Georgia, identity not yet known, who, as described in Paragraph 25 of this complaint, contacted Mr. Jacobs' employer with the intention and successful result of getting Mr. Jacobs fired from his job because of his

distribution of controversial leaflets, i.e., the alleged "littering" offenses which are the subject of this action.

16.  Defendant Matt Gray is a high-ranking officer, on information and belief a major, in the Douglas County Sheriff's Office.

17.  Defendant Gray and defendants John Does 1-8 are the law enforcement personnel who, as described in Paragraph 28 of this complaint, served the bogus warrants on Mr. and Mrs. Jacobs and then promptly arrested them.

18.  The Douglas County Sheriff's Office, on information and belief, was the employer of Myrlene Jean, Chuck Catlin, Melinda Wright, Matt Gray, and some or all of John Does 1-8. The plaintiffs are suing it and the other government Entity Defendant, Douglas County, pursuant to the well-established principle of law set forth by the United States Supreme Court in _Monell v. Department of Social Services,_ 436 U. S. 658 (1978) (hereafter referred to as _Monell_) because the Entity Defendants recklessly failed to instruct the law enforcement officer defendants in their duty to respect the well-known and basic free speech rights of citizens and other persons lawfully within their jurisdiction.

19.  Douglas County, Georgia, on information and belief, was the employer of Myrlene Jean, Chuck Catlin, Melinda Wright, Matt Gray, Jane Doe 1, and some or all of John Does 1-8. It is sued under _Monell_ because of its deliberate indifference to and reckless disregard of the plaintiffs' free speech rights.

20.  At all times described above, the "Individual Defendants," i.e., Myrlean Jean, Chuck Catlin, Melinda Wright, Jane Doe, Matt Gray, and John Does 1-8, were clothed with authority from the state and acted under color of law and were state actors.

7

21. Nevertheless, as state actors operating under color of law, the Individual Defendants came into conflict with the superior authority of the United States Constitution, particularly the First and Fourteenth Amendments thereof, and were therefore stripped of their official or representative character and are rightly subjected in their persons to the consequences of their lawless conduct.

## FACTS COMMON TO ALL COUNTS

22. The crux of this complaint concerns flyers distributed by the defendants in Douglas County. The flyers consisted of prints of a subset of the flyers shown on this link: https://www.gtvflyers.com/. The flyers were folded in Ziploc bags and tossed into residential yards. The flyers are critical of what their authors consider to be undue Jewish power and influence in America and the world. The flyers assert, for example, that "Every Single aspect of the Media is Jewish" and "Every Single Aspect of Pornography and Hook Up Culture is Jewish."

23. For several months prior to the arrest of the Jacobs in November 2023, the defendants had distributed their flyers in approximately fifty Georgia counties and had not been arrested or harassed by law enforcement for doing so. Several county sheriffs, indeed, publicly acknowledged that the defendants' distributions were protected free speech. *See, e.g.,* https://www.gpb.org/news/2023/02/16/no-legal-recourse-for-antisemitic-flyers-dunwoody-police-say (quoting Dunwoody, Georgia Police Chief Billy Grogan: "After conducting a thorough investigation and discussing this with the district attorney's office and the city's solicitor's office, there is no charge that we can make against them." "It's a free speech issue." "Lots of things are thrown in people's yards, and we cannot enforce one because we don't like the content and not enforce the other . . . It would be a disparate enforcement of the law and one that could potentially jam us up, legally.")

24. The FBI in April 2023 similarly publicly acknowledged that distribution of the flyers was protected by the First Amendment.

25. A few months prior to November 2023, however, a woman came to Mr. Jacobs' workplace, asked Mr. Jacobs to identify himself, and then went into the office of his supervisor to speak with the supervisor. Jacobs was fired that very day. Later, at Mr. Jacobs' bond hearing, he noticed this woman in the presence of the team of lawyers and staff representing the prosecutor's office. This woman is described as Jane Doe in Paragraph 15 above.

26. On or about November 3, 2023, defendant Chuck Catlin executed numerous affidavits falsely stating that Mr. and Mrs. Jacobs, by distributing the flyers, had committed in Douglas County the offense of littering in violation of O.C.G.A. 16-7-43(M). Defendant Catlin's affidavits were used as a basis for issuing arrest warrants against the Jacobs.

27. On or about November 3, 2023, defendant Myrlene Jean executed numerous affidavits falsely stating that Mr. and Mrs. Jacobs, by distributing the flyers, had committed in Douglas County the offense of littering in violation of O.C.G.A. 16-7-43(M). Defendant Jean's affidavits were then used as a basis for issuing arrest warrants against the couple.. Anomalously, defendant Jean also executed affidavits leading to warrants dated November 6, 2023, which was after the date the Jacobs had been arrested.

28. On November 3, 2023, Defendants Matt Gray and John Does 1-8 served the warrants and arrested Mr. and Mrs. Jacobs at their home in Harelson County, Georgia. The defendants served the warrants and made the arrests of the Jacobs with guns drawn and in a belligerent "shock and awe" manner unjustified by any potential threat the Jacobs presented and grossly disproportionate for warrants alleging "littering." When Mrs. Jacobs requested to see the warrants, her request was refused.

29.  Mr. and Mrs. Jacobs spent five days incarcerated in the Douglas County Jail.  Mr. Jacobs was mistreated during this time, including suffering an assault from a jail guard.

30. On the second day of their incarceration, the Jacobs were brought before a judicial officer to determine their bond.  At this bond hearing, they learned they had been charged with 302 counts of littering based on the distribution of the flyers. The judicial officer set their bond at $30,000 each. The couple then remained incarcerated for another three days, as they are not affluent and it took them this long to raise the $4000 fee to pay for a bail bonding agency to assume responsibility for their appearance in court to answer these charges.

31.  After the Jacobs' release, the publicity from their arrest, which was extensively covered in local newspapers and television, increased the harassment they received from antifa (referring to locally active anti-fascists) and similar groups.  For that reason after they were released they left Georgia for another state as soon as it was practicable for them to do so.

32.  Soon after the Jacobs' arrest, strong evidence came to Michael Weaver's attention that he too was the subject of warrants similarly charging him with multiple counts of littering based on distribution of these flyers. This evidence included the fact that police came to his former apartment with a warrant and the fact that his father while driving a car registered in Michael Weaver's name was stopped multiple times by law enforcement, who informed the father that there was a warrant out for his son's arrest.

33. Lacking the financial wherewithal to pay the likely $30,000 bond and the probable $2,000 surety fee -- if he were even given bond, an uncertainty -- and therefore facing indefinite and dangerous incarceration, Mr. Weaver changed his residence and went into reclusion. The reclusion thus unconstitutionally forced on Mr. Weaver has cut off his ability to drive and to

practice his vocation as a personal trainer or indeed to engage in any other work, separated him from his daughter and aged father, and in general has inflicted great emotional harm on him.

34.  After the Jacobs were arrested and released on bail, no further actions have been taken by the Douglas County prosecutor to prosecute the bogus littering cases against them, even though over 15 months have now elapsed. In particular, no accusation has ever been filed. Under Georgia criminal procedure, however, the filing of an accusation  is necessary to commence a prosecution. *See, e.g., Davis v. State,* 307 Ga. 784, 787-88 (Ga. 2020) (prosecutor must initiate an action, through an indictment or accusation, before a person can file a pleading, such as a plea in bar, challenging such a prosecution).

35. Mr. and Mrs. Jacobs  and Mr. Weaver  have thus been placed into a kind of legal limbo, with the threat of the unconstitutional prosecution for littering hanging over them but with no case thus far opened to challenge such a spurious proceeding.  From the perspective of the defendants, however, this is the ideal result: it effectively prevents the plaintiffs from exercising their constitutional right to distribute flyers while insulating the defendants from answering to a court for their improper conduct.

### The Flyers Distributed by the Defendants Were Not "Litter"

### Under the Georgia Criminal Code Provision Prohibiting Littering

36.  As even the most elementary statutory analysis of the Georgia littering  statute, Sections 16-7-42 and 16-7-43, makes manifest, the flyers distributed by the defendants were not "litter" within the purview of that statute.  This conclusion is corroborated by the Georgia Supreme Court's decision in *Statesboro Publishing Co., Inc. v. City of Sylvania*, 271 Ga. 92, 516 S.E.2d 296 (1999) (hereafter simply referred to as Statesboro Publishing).

37.    Section 16-7-43 of the Georgia Criminal Code, entitled "Unlawful Activities," provides:

(a) It shall be unlawful for any person or persons to dump, deposit, throw, or leave or to cause or permit the dumping, depositing, placing, throwing, or leaving of litter on any public or private property in this state or any waters in this state, unless:

(1) The area is designated by the state or by any of its agencies or political subdivisions for the disposal of litter and the person is authorized by the proper public authority to so use such area;

(2) The litter is placed into a nondisposable litter receptacle or container designed for the temporary storage of litter and located in an area designated by the owner or tenant in lawful possession of the property; or

(3) The person is the owner or tenant in lawful possession of such property or has first obtained consent of the owner or tenant in lawful possession or unless the act is done under the personal direction of the owner or tenant, all in a manner consistent with the public welfare.

(b)(1) Any person who violates subsection (a) of this Code section shall be guilty of a misdemeanor.

38.   Section 16-7-42 of the Code defines "litter" as follows:

As used in this part, the term:

(1) "Litter" means any discarded or abandoned:

(A) Refuse, rubbish, junk, or other waste material; or

(B) Dead animals that are not subject to the provisions of Code Section 4-5-4.

39.    The flyers distributed by the Jacobs do not come close to meeting this statutory definition of "litter" or any commonly understood definition of the term. The rules of statutory construction forbid a subtle or forced construction for the purposes of either limiting or extending a statute's operation or reaching absurd results. *Sliney v. State*, 260 Ga. 167, 168, 391 S.E.2d 114,

115 (1990). Statutes should be read according to the natural and most obvious import of their language. *Choicepoint Services, Inc. v. Graham*, 305 Ga. App. 254, 699 S.E. 2d 452, 455 (2010). Moreover, "a penal statute must always be interpreted strictly against the State and in favor of human liberty." *State v. Crumpton*, 369 Ga. App. 403, 893 S.E.2d 816, 820 (2023).

40. The flyers were not "discarded" or "abandoned"; to the contrary, they were intentionally distributed into residential yards with the hope they would be read. The flyers were not "refuse, rubbish, junk, or other waste material"; to the contrary, they were carefully prepared documents meant to influence public opinion. If basic principles of free speech are to be respected, as they must be – a topic addressed in the following section – the Jacobs' flyers are no more "refuse, rubbish, junk, or other waste material" than other flyers, leaflets, or pamphlets that communicate a political or even a commercial message.

**Restricting the Jacobs (or Anyone Else) from Distributing Their Flyers Based Upon Their Viewpoint or Content Violates These Persons' Free Speech Rights Under the First Amendment to the United States Constitution and Corresponding Provisions of the Georgia Constitution.**

41. The flyers distributed by the Jacobs may have been offensive to many. The fact that messages communicated by flyers or other means arouse anger, disgust, or antipathy, however, is not a reason to deny them protection under the First Amendment or the Georgia Constitution; to the contrary, it is the principal reason they require protection. As the United States Supreme Court stated in

*Snyder v. Phelps*, 562 U.S. 443, 460-61 (2011):

> Speech is powerful. It can stir people to action, move them to tears of both joy and sorrow, and—as it did here—inflict great pain. On the facts before us, we cannot react to

that pain by punishing the speaker. As a Nation we have chosen a different course—to protect even hurtful speech on public issues to ensure that we do not stifle public debate.

*United States v. Schwimmer*, 274 U.S. 644, 655 (1929) (Holmes, Justice):

[I]f there is any principle of the Constitution that more imperatively calls for attachment than any other it is the principle of free thought—not free thought for those who agree with us but freedom for the thought that we hate.

See also *Equity Prime Mortgage v. Greene for Congress, Inc.*, 366 Ga. App. 207, 211, 880 S.E.2d 642, 647 (2022) (speech on matters of public concern is at the heart of the First Amendment's protection).

42.   In accord with this national commitment to robust and uninhibited freedom of speech, the United States Supreme Court and other courts have repeatedly rejected attempts by local governments to use littering and similar statues to restrict expression of opinions through distribution of flyers, pamphlets, leaflets, and similar means. *See, e.g., Lovell v. City of Griffin, Georgia*, 303 U.S. 444 (1938); *Schneider v. State of New Jersey*, 308 U.S. 147 (1939); *Martin v. City of Struthers, Ohio*, 319 U.S. 141 (1943); *Ramsey v. City of Pittsburgh, Pennsylvania*, 764 F.Supp.2d 728, 732 (W.D. Pa. 2011) ("The right to distribute literature may not be withdrawn even if it creates the minor nuisance for a community of cleaning literature from its streets."); *Van Nuys Publishing Co., Inc. v. City of Thousand Oaks, California*, 5 Cal. 3d 817, 825, 489 P.2d 809, 813 (1971) ("Door to door distribution of circulars is essential to . . . poorly financed causes ").

43.   The courts have also upheld the right of persons to distribute pamphlets, leaflets, and brochures anonymously. *See, e.g., McIntyre v. Ohio Elections Commission*, 514 U.S. 334 (1995) ("[A]n author's decision to remain anonymous, like other decisions concerning omissions or additions to the content of a publication, is an aspect of the freedom of speech protected by the First Amendment.").

44.   Of particular relevance here is the Georgia Supreme Court's decision in *Statesboro Publishing*. In that case, the Statesboro Publishing Company delivered the *Penny–Saver*, a weekly

shopper newspaper, without charge to Sylvania city residents by throwing the paper in yards or driveways. To deal with the litter caused by unclaimed papers, the city enacted an ordinance that prohibited distribution of free printed material in yards, driveways, or porches. The city sought a declaratory judgment and the trial court upheld the ordinance as constitutional. The Georgia Supreme Court, however, held that the ordinance was not narrowly tailored to meet the city's interest in preventing litter, failed to provide meaningful alternatives of communication, and accordingly violated the publisher's right to freedom of speech and press under the United States and Georgia Constitutions.

45. *Statesboro Publishing* is dispositive of this case. To justify and defend the arrests of Mr. and Mrs. Jacobs the defendants would need to urge an interpretation of the Georgia littering statutes -- Sections 16-7-42 and 16-7-43 of the Georgia Code – under which the distribution of the Jacobs' flyers could lawfully be criminalized and prohibited. The *Statesboro Publishing* case demonstrates that such an interpretation would collide directly with Constitutional protections. The ordinance at issue in *Statesboro Publishing* was stricken as not narrowly tailored to protect free speech rights. It was, however, far more narrowly tailored than any interpretation of the Georgia littering statutes the defendants would be constrained to advance in this case in order to justify their actions. The *Statesboro Publishing* ordinance was also stricken because it failed to provide meaningful alternatives of communication; but the ordinance provided far more communication alternatives than these defendants' assumed interpretation of the Georgia littering statue would provide, namely none. The defendants' assumed construction of the statutes, accordingly, would cause the statutes to be invalidated on Constitutional grounds, as applied to this case and perhaps facially.

## CAUSES OF ACTION

### I.

### (42 U.S.C. § 1983 -- First Amendment Retaliation;

### All Plaintiffs Against All Defendants)

46.  Plaintiffs reallege and incorporate the allegations set forth in Paragraphs 1 through 45.

47.  When alleging a First Amendment retaliation claim, a plaintiff must show (1) that plaintiff's speech was protected; (2) defendant's alleged retaliatory action adversely affected the plaintiff's constitutionally protected speech; and (3) a causal relationship exists between plaintiff's speech and the defendant's retaliatory action.

48.  The plaintiffs here were engaged in protected speech, in that their distribution of the flyers at issue in this case was protected by the First Amendment.

49.  The Individual Defendants, i.e., defendants Jean, Catlin, Wright, Gray, Jane Doe, and John Does 1-8, individually and also in a coordinated effort adversely affected the plaintiffs' constitutionally protected speech, in that the Individual Defendants caused warrants to be issued against the plaintiffs on the false ground that the flyers plaintiffs distributed were "litter," which resulted in the unjustified arrests and incarceration of the Jacobs and Mr. Weaver's forced reclusion, and, on account of the conduct of Jane Doe, caused Mr. Jacobs to be terminated from his employment.

50.  As a direct and proximate result of the Individual Defendants' unconstitutional actions, the Plaintiffs have suffered and continue to suffer substantial past and future damages, both compensatory and general, including but not limited to loss of income, severe emotional distress, mental anguish, embarrassment, humiliation, and consequential damages.

51.  The arrests, incarceration, and threatened prosecutions to which the Jacobs were subjected and the probability of future similar arrests, incarceration, and prosecutions were fully sufficient to chill and deter persons of ordinary firmness from exercising their constitutional rights to distribute political pamphlets and in fact did chill and deter the Jacobs and Mr. Weaver from doing so.

52.  Because Individual Defendants' actions were "motivated by evil motive or intent" and/or "involve[d] a reckless or callous indifference to the federally protected rights of [the Plaintiffs]," an award of punitive damages is appropriate to the fullest extent permitted by law. *See Smith v. Wade*, 461 U.S. 30 (1983).

53.  The Entity Defendants, i.e., the Douglas County Sheriff's Office and Douglas County itself, are liable under *Monell* for the actions of the Individual Defendants because the Entity Defendants failed to properly train the Individual Defendants to recognize and respect the plaintiffs' broad-based right to freedom of speech and expression set forth in both the United States and the Georgia Constitutions.

54. The Entity Defendants are also liable under *Monell* because the actions of the Individual Defendants reflect a deliberate policy of neglect and indifference on the part of the Entity Defendants.  This policy is manifested, among other ways, in the involvement of so many of the Individual Defendants in the same unconstitutional scheme, and also in the fact that in none of the fifty other Georgia counties in which plaintiffs distributed the flyers did the counties or their sheriff's offices interfere with plaintiffs' constitutional rights to distribute the flyers.

55.  All the defendants, i.e., the Individual Defendants and the Entity Defendants, are state actors who acted under color of state law.

WHEREFORE, Plaintiffs demand judgment against defendants in amounts to be determined at trial but in excess of $75,000 in compensatory and punitive damages, plus costs, reasonable attorneys' fees, and such other and further relief as the Court deems just and appropriate.

## II.

### (42 U.S.C. § 1983 – Violations of Fourth and Fourteenth Amendments – Jacobs Plaintiffs Against All Defendants)

56. Plaintiffs reallege and incorporate the allegations set forth in Paragraphs 1 through 45.

57. As described in this complaint, the Individual Defendants both individually and working together arranged for the issuance of warrants against Mr. and Mrs. Jacobs based on the false premise that the Jacobs' distribution of the flyers was "littering."

58. As a result of these warrants, the Jacobs were arrested and incarcerated, depriving them of their liberty and freedom of movement and violating their rights under the Fourth and Fourteenth Amendments to the United States Constitution.

59. The Individual Defendants' conduct was without legal justification. No probable cause existed to arrange for the issuance of warrants and the resulting arrests of the Jacobs. Precedents from the United States Supreme Court and the Georgia Supreme Court made clear that the plaintiffs' distribution of the flyers was protected under the federal and Georgia constitutions.

60. As a result of the Individual Defendants' actions, the Jacobs suffered compensatory damages, including loss of income, and emotional distress.

61. Because the Individual Defendants' actions were "motivated by evil motive or intent" and/or "involve[d] a reckless or callous indifference to the federally protected rights of [the

Plaintiffs]," an award of punitive damages is appropriate to the fullest extent permitted by law. See *Smith v. Wade*, 461 U.S. 30 (1983).

62. The Entity Defendants, i.e., the Douglas County Sheriff's Office and Douglas County, are liable under *Monell* for the actions of the Individual Defendants because the Entity Defendants failed to properly train the Individual Defendants to recognize and respect the plaintiffs' free speech rights under the First, Fourth, and Fourteenth Amendments to the United States Constitution.

63. The Entity Defendants are also liable under *Monell* because the actions of the Individual Defendants reflect a deliberate policy of deliberate indifference and reckless disregard on the part of the Entity Defendants. This policy is manifested, among other ways, in the involvement of so many of the Individual Defendants in the same unconstitutional scheme, and also in the fact that in none of the fifty other Georgia counties in which plaintiffs distributed the flyers did these counties or their sheriff's offices interfere with plaintiffs' constitutional rights to distribute the flyers.

64. All the defendants, i.e., the Individual Defendants and the Entity Defendants, are state actors who acted under color of state law.

**WHEREFORE,** the Jacobs demand judgment against the defendants in amounts to be determined at trial but in excess of $75,000 in compensatory and punitive damages, plus costs, reasonable attorneys' fees, and such other and further relief as the Court deems just and appropriate.

### III.

### (42 U.S.C. § 1983 – Violations of Fourth and Fourteenth Amendments –
### Plaintiff Michael Weaver Against All Defendants)

65. Plaintiffs reallege and incorporate the allegations set forth in Paragraphs 1 through 45.

66. As described in this complaint, the Individual Defendants both individually and working together arranged for the issuance of a warrant or multiple warrants against plaintiff Michael Weaver based on the false premise that Mr. Weaver's distribution of flyers was "littering."

67. As a result of the issuance of the warrants, Mr. Weaver was deprived of his liberty and freedom of movement in violation of his rights under the First and Fourteenth Amendments to the United States Constitution in that he was forced at peril of unconstitutional arrest and indefinite and perilous incarceration into reclusion, unable to drive a car, pursue his vocation, or interact with his friends and loved ones.

68. The Individual Defendants' conduct was without legal justification. No probable cause existed to arrange for the issuance of warrants and the resulting threat of arrest. Precedents from the United States Supreme Court and the Georgia Supreme Court have continuously made clear and incontestable the proposition that the plaintiffs' distribution of the flyers was protected under the federal and Georgia constitutions.

69 As a result of the Individual Defendants' actions, Mr. Weaver suffered compensatory damages, including loss of income, and emotional distress.

70. Because the Individual Defendants' actions were "motivated by evil motive or intent" and/or "involve[d] a reckless or callous indifference to the federally protected rights of [the Plaintiffs]," an award of punitive damages is appropriate to the fullest extent permitted by law. See *Smith v. Wade*, 461 U.S. 30 (1983).

71.  The Entity Defendants, i.e., the Douglas County Sheriff's Office and Douglas County, are liable under *Monell* for the actions of the Individual Defendants because the Entity Defendants failed to properly train the Individual Defendants to recognize and respect the plaintiffs' rights under the First, Fourth, and Fourteenth Amendments to the United States Constitution..

72. The Entity Defendants are also liable under *Monell* because the actions of the Individual Defendants reflect a deliberate policy of the Entity Defendants. This policy is manifested, among other ways, in the involvement of so many of the Individual Defendants in the same unconstitutional scheme, and also in the fact that in none of the fifty other Georgia counties in which plaintiffs distributed the flyers did these counties or their sheriff's offices interfere with plaintiffs' constitutional rights to distribute the flyers.

73.  All the defendants, i.e., the Individual Defendants and the Entity Defendants, are state actors who acted under color of state law.

**WHEREFORE**, Mr. Weaver demands judgment against the defendants in amounts to be determined at trial but in excess of $75,000 in compensatory and punitive damages, plus costs, reasonable attorneys' fees, and such other and further relief as the Court deems just and appropriate.

**IV.**

**(Declaratory Judgment; All Plaintiffs Against All Defendants)**

74.  Plaintiffs reallege and incorporate the allegations set forth in Paragraphs 1 through 45.

75.  The Plaintiffs were engaged in protected speech, in that their distribution of the flyers at issue in this case was an activity protected by the First Amendment to the United States Constitution.

76.    The defendants have violated and seek to continue to violate plaintiffs' First Amendment rights by an ill-founded and unconstitutional interpretation of the Georgia statute prohibiting littering, i.e., Section 16-7-42, such that in defendants' interpretation plaintiffs' distribution of flyers constitutes "littering."

77. There is a real, substantial, and immediate controversy and adverse relationship between the plaintiffs and the defendants, in that the parties strongly disagree regarding the interpretation of Section 16-7-42 and the constitutionality of interpreting this statute to criminalize plaintiffs' distribution of flyers.

**WHEREFORE,** Plaintiffs request a declaratory judgment pursuant to 28 U.S.C. § 2201 that plaintiffs' conduct in distributing flyers as described in this complaint does not constitute "littering" under Sections 16-7-42 and 16-7-43 of the Georgia Criminal Code and is conduct protected under the First Amendment of the United States Constitution.

**V.**

**(False Imprisonment – The Jacobs Plaintiffs Against the Individual Defendants)**

78.  Plaintiffs reallege and incorporate the allegations set forth in Paragraphs 1 through 45.

79.  As described in this complaint, the Individual Defendants both individually and working together arranged for the issuance of warrants against the Jacobs based on the false premise that the Jacobs' distribution of flyers was "littering."

80.  As a result of these warrants, the Jacobs were arrested and incarcerated, depriving them of their liberty and freedom of movement.

81.  The Individual Defendants' conduct was without legal justification.  No probable cause existed to arrange for the issuance of warrants and the resulting arrests of the Jacobs. Precedents

from the United States Supreme Court and the Georgia Supreme Court made clear that the plaintiffs' distribution of the flyers was protected under the federal and Georgia constitutions.

82. As a result of the Individual Defendants' actions, the Jacobs suffered compensatory damages, including loss of income, and emotional distress.

83. Because the Individual Defendants' actions constituted malicious and wanton misconduct, the Jacobs are entitled to punitive damages under Georgia law.

84. The Entity Defendants are liable under the doctrine of respondeat superior for the actions of the Individual Defendants.

**WHEREFORE**, the Jacobs demand judgment against the defendants in amounts to be determined at trial but in excess of $75,000 in compensatory and punitive damages, plus costs, reasonable attorneys' fees, and such other and further relief as the Court deems just and appropriate.

## VI.

### (False Imprisonment – Michael Weaver Against the Individual Defendants)

85. Plaintiffs reallege and incorporate the allegations set forth in Paragraphs 1 through 45.

86. As described in this complaint, the Individual Defendants both individually and working together arranged for the issuance of a warrant or multiple warrants against plaintiff Michael Weaver based on the false premise that Mr. Weaver's distribution of flyers was "littering."

87. As a result of the issuance of the warrants, Mr. Weaver was forced into reclusion and deprived of his liberty and freedom of movement.

88. The Individual Defendants' conduct was without legal justification. No probable cause existed to arrange for the issuance of warrants and the resulting arrests. Precedents from the United States Supreme Court and the Georgia Supreme Court overwhelmingly support the conclusion

23

that the plaintiffs' distribution of the flyers was protected under the federal and Georgia constitutions.

89. As a result of the Individual Defendants' actions, Mr. Weaver suffered compensatory damages,9including loss of income, and emotional distress.

90.   Because the Individual Defendants' actions constituted malicious and wanton misconduct, the Jacobs are entitled to punitive damages under Georgia law.

91.   The Entity Defendants are liable under the doctrine of respondeat superior for the actions of the Individual Defendants.

**WHEREFORE**, the Mr. Weaver demands judgment against the defendants in amounts to be determined at trial but more than $75,000 in compensatory and punitive damages, plus costs, reasonable attorneys' fees, and such other and further relief as the Court deems just and appropriate.

## VII.

### (Abuse of Process – All Plaintiffs Against All Defendants)

92. Plaintiffs reallege and incorporate the allegations set forth in Paragraphs 1 through 45.

93. The defendants made an improper use of legal process, namely the issuance of warrants against the plaintiffs on the false premise that the plaintiffs' distribution of flyers constituted the criminal conduct of "littering."

94. The defendants' motive in thus abusing process was to intimidate the plaintiffs from continuing to distribute flyers, even though this distribution did not constitute littering and was protected conduct under the First Amendment.

95. The defendants' improper, tortious, and unconstitutional conduct harmed the plaintiffs, causing them loss of income, loss of freedom of movement, and emotional distress.

96. Because the Individual Defendants' actions constituted malicious and wanton misconduct, the plaintiffs are entitled to punitive damages under Georgia law.

97. The Entity Defendants are liable under the doctrine of respondeat superior for the actions of the Individual Defendants.

**WHEREFORE**, plaintiffs demand judgment against the defendants in amounts to be determined at trial but more than $75,000 in compensatory and punitive damages, plus costs, reasonable attorneys' fees, and such other and further relief as the Court deems just and appropriate.

## VIII.

### (Preliminary Injunction – Plaintiff Weaver Against All Defendants)

98. Plaintiffs reallege and incorporate the allegations set forth in Paragraphs 1 through 97.

99. As described in this complaint, it is manifest that defendants possess and seek to serve on Mr. Weaver one or more warrants identical or similar to the warrants served on the Jacobs, i.e., seeking his arrest and prosecution on charges of "littering."

100. Mr. Weaver requests a preliminary injunction barring the defendants from further attempts to serve any warrant on him based on such "littering" claims, until they are finally adjudicated by this Court and in any subsequent appeal.

101. As described in this complaint, any warrants issued against Mr. Weaver based on "littering" violate basic principles of statutory construction and the First Amendment.

102. For the reasons described in this complaint, Mr. Weaver can demonstrate a probability of success on the invalidity and unconstitutionality of the warrants and the "littering" charges on which they are based.

103. Mr. Weaver will suffer irreparable harm if this preliminary injunction is not granted, in that money damages will not fully compensate him for the emotional injury he will continue to suffer from being forced into reclusion, as described in this complaint.

104. The balance of equities weighs decisively in Mr. Weaver's favor. The defendants will suffer no harm from foregoing further attempts to serve warrants on Mr. Weaver, pending a final adjudication of the statutory validity and constitutionality of such warrants. Mr. Weaver, by contrast, will suffer grave injury from defendants' continued attempts and intention to serve the warrants, including lost income, loss of freedom of movement, and emotional harm.

105. The public interest is manifestly served by granting the preliminary injunction Mr. Weaver seeks, in that Mr. Weaver, as any American citizen, is entitled to be free from the harassment and harm resulting from the maintenance and continuation of warrants directed to all law enforcement agencies in the United States despite the fact that every single one of them originated from wholly unconstitutional and therefore illegal government acts.

WHEREFORE, plaintiff Michael Weaver respectfully asks that defendants be enjoined from further attempts to serve warrants on him based on charges of "littering," as described in this complaint, until a final adjudication takes place concerning the statutory validity and constitutionality of these documents.

Respectfully submitted,

Charles Randall Sheppard, Esq.

P. O. Box 1697

Evans, GA 30809

Georgia State Bar Number 641938

Glen K. Allen, Esq.

5423 Springlake Way

Baltimore, MD 21212

(Pro hac vice application pending)