UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISON

HILARY AKIN JACOBS, et al.,

    Plaintiffs,

        v.                        Civil Action No. 1:25-cv-01270-SDG

CHUCK CATLIN, et al.,

    Defendants

---

**PLAINTIFFS' MOTION FOR LEAVE TO FILE AN AMENDED COMPLAINT AND MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

### INTRODUCTION

Plaintiffs request leave to file an amended complaint. Their amended complaint, they respectfully submit, constitutes a complete response to the motion to dismiss Defendants filed to Plaintiffs' initial complaint. To avoid any doubt on this point, however, Plaintiffs here also submit an opposition to Defendants' motion to dismiss.

    I.    **REQUEST FOR LEAVE TO FILE AN AMENDED COMPLAINT**

**PLAINTIFFS SHOULD BE PERMITTED TO FILE THE ATTACHED AMENDED COMPLAINT, WHICH MERELY AMPLIFIES FACTS PREVIOUSLY ALLEGED AND NAMES NEW PARTIES OWING TO NEW DEVELOPMENTS THAT HAVE ARISEN SINCE PLAINTIFFS' INITIAL COMPLAINT.**

Attached to this motion for leave as Attachment A is Plaintiffs' Proposed Amended Complaint. It is both statutory and axiomatic that leave to amend should freely be given under FRCP 15 (a)(2) and Eleventh Circuit precedent such as *Bryant v. Dupree*, 252 F.3d 1161 (11th

Cir. 2001). "A district court's discretion to dismiss a complaint without leave to amend 'is "severely restrict[ed]" by Fed. R. Civ. P. 15(a), which directs that leave to amend "shall be freely given when justice so requires."' *Id.* at 1165, *quoting Thomas v. Town of Davie*, 847 F.2d 771, 773 (11th Cir.1988) (additional citations omitted). "'Generally, '[w]here a more carefully drafted complaint might state a claim, a plaintiff must be given at least one chance to amend the complaint before the district court dismisses the action with prejudice.'" *Id., quoting Bank v. Pitt*, 928 F.2d 1108, 1112 (11th Cir. 1991).

Here there is no hint of undue delay, bad faith, or dilatory motive on the part of Plaintiffs, nor are there repeated failures to cure deficiencies and no undue prejudice to Defendants. Plaintiffs respectfully submit that the amendment should be permitted especially given that it is now necessary to add additional parties to the litigation given the long delayed filing of an accusatory instrument against the Plaintiffs Mr. and Mrs. Jacobs in state court.

The Proposed Amended Complaint meets and overcomes the issues raised by Defendants' Motion to Dismiss, even as it does not oppose the dismissal (without prejudice) of certain parties and causes of action. Specifically, the Proposed Amended Complaint:

Does not name Douglas County;

Does not name the Douglas County Sheriff's Office; and

Does not plead the tort of false arrest.

On the other hand, as shown by the Amended Complaint, there is:

No merit to the notion that Plaintiffs have failed to plausibly plead First Amendment Retaliation (especially as to Defendants Catlin, Jeana and Wright);

No merit to the notion that Plaintiffs have failed to plead the utter and complete absence of even arguable probable cause;

No merit to the notion that Plaintiffs have not overcome Defendants' qualified immunity defense.

II. **PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PALINTIFFS' INITIAL COMPLAINT**

A. **Plaintiffs' John Doe Pleading Is Proper.**

There is no merit to the notion that the John Doe Defendants are not described with sufficient clarity in the Amended Complaint such that process cannot be served, nor that discovery will not reveal who they are. As such they can be sued under fictitious names. *Dean v. Barber*, 951 F.2d 1210, 1215-1216 (11th Cir. 1992).

B. **Colportage Does Not Morph into Litter Because the State Authorities Hate Plaintiffs' Speech.**

The facts of this action are straightforward, as is the application of the law. As Plaintiffs' factual allegations / facts are relevant not only to Defendants' motion to dismiss but also to the Likelihood of Success element of Plaintiffs' separate motion for preliminary injunctions, Plaintiffs will cite below both to their Amended Complaint and to the two affidavits (Philip Jacobs and Michael Weaver) attached to Plaintiffs' Motion for Preliminary Injunctions.

On November 2, 2023, as they had done for several months, Plaintiffs Philip Jacobs and Michael Weaver distributed colportage exemplified by the flyers attached as Exhibits 1 and 2 to the Amended Complaint to houses in residential sections of Lithia Springs, Georgia. Am. Compl, ¶¶ 17-24; *Jacobs Aff.* at ¶¶ 1, 6, 9-13; *Weaver Aff.* at ¶ 1, 7-11. Plaintiff Hilary Jacobs did not

distribute any such flyers on November 2, 2023, though warrants would be secured for her arrest and she would be arrested alongside her husband, Philip Jacobs the following day, on November 3, 2023. *Id.* Each flyer was singly wrapped in a Ziploc baggie and weighted by corn kernels to prevent them from blowing about the neighborhood like litter. *Id.* Each flyer consisted of the same kind of controversial message exemplified by Exhibits 1 and 2, and each Ziploc baggie contained only a single flyer and the corn kernel ballast. *Id.* Furthermore, each flyer was thrown onto private property, usually a driveway or porch, or as close thereto as possible. *Id.* The flyers were not "thrown or left" on "public property," as falsely stated in the affidavits at Exhibit A to Defendants' Motion to Dismiss at RE. 39-2, but even if they had been Defendants here would still be attempting to apply their criminal statutes in an overbroad manner that violates the First Amendment, as set forth below in Plaintiff's argument for injunctive relief.

Unlike litter, no Ziploc baggie contained a miscellany of items such as would be found if the flyers had been mere litter – thus there were no random papers included in the baggies, and no discarded oddments such as old fruit, bits of food, used items, or damaged goods, etc. *Id.*

On November 3, 2023, at least two officers of the Douglas County Sheriff's Office appear to have investigated the colportage that Plaintiffs Philip Jacobs and Michael Weaver had distributed. *RE 39-2*. These were Defendants Chuck Catlin and Myrlene Jean. Am. Compl. ¶¶ 32-36. They appear to have gathered numerous Ziploc baggies consisting of the colportage as evidence.

On November 3, 2023, Defendant Catlin swore out affidavits seeking the arrest of Plaintiffs Hilary Jacobs, Philip Jacobs, and Michael Weaver for allegedly violating the littering statute at Georgia Code §16-7-43(M). *Id.; see warrants attached to Defendants' Motion to Dismiss, i.e., Warrant Nos. 23MSC01231, 23MSC01232, and 23MSC01233*. The affidavits were passed

4

through another officer of the Douglas County Sheriff's Office identified as Defendant Melinda Wright, who, after apparently reviewing the underlying evidence, used such affidavits to secure arrest warrants for the alleged littering offense from one Judge Susan S. Camp in Magistrate Court for Douglas County, Georgia. Am Compl. ¶¶ 45-48.

That very day (November 3, 2023) Defendant Matt Gray of the Douglas County Sheriff's office gathered at least eight other deputies and proceeded to Plaintiff Philip and Hilary Jacobs premises, which consisted of a trailer home. Am Compl. ¶¶ 63-71; *Jacobs Aff.* ¶¶ 20-27. The deputies surrounded Plaintiffs Mr. and Mrs. Jacobs's home so that there was no danger of escape, and with guns drawn, served the warrants for littering. *Id.* On account of the littering charges, Plaintiff Philip Jacobs was arrested, placed in handcuffs, and taken away in his underwear with no opportunity to even dress himself. *Id.* Plaintiff Hilary Jacobs was also arrested, placed in handcuffs and taken away. *Id.*

On November 6, 2023, Defendant Myrlene Jean swore out additional affidavits for the arrest of Plaintiffs Hilary Jacobs, Philip Jacobs, and Michael Weaver again for allegedly violating the littering statute at Georgia Code §16-7-43(M) by distributing colportage in Lithia Springs on November 2, 2023. *RE 39-2, referencing Warrant Nos. 23MJD03967, 23MJD03968, 23MJD03969, 23MJD03970, 23MJD03971, 23MJD03972, 23MJD03973, 23MJD03974, 23MJD03975, 23MJD03976, 23MJD03977, and 23MJD03978.* These too were passed through Defendant Wright as the prosecuting officer, who used them to secure arrest warrants for Plaintiffs Hilary Jacobs, Philip Jacobs, and Michael Weaver from a Judge "Joel S.___" (whose name is not fully legible). Am. Compl. ¶¶ 45-48.

Altogether, Defendants Catlin, Jean and Wright swore out at least fifteen affidavits accusing Plaintiffs of littering in violation of Georgia Code §16-7-43(M). Warrants attached to

Defendants' Motion to Dismiss; *RE. 39-2*. Not a single one of those affidavits reveals that the "paper" described was in fact political or religious messaging – colportage, rather than the "discarded or abandoned" "[r]efuse, rubbish, junk, or other waste material" that is defined as litter under Georgia's statute. Georgia Code §16-7-42(M). Instead, each and every affidavit gives the misleading statement that Plaintiffs had thrown "plastic bags with paper inside the plastic bags."

But of course "paper" is not always simply "paper," and for First Amendment purposes there is a world of difference between papers which are delivered as colportage and, say, papers which consist of actual litter, such as used tissue or discarded newspaper stained with cooking oil. Likewise with plastic bags or baggies: is the bag a garbage bag — or is it a wrapper protecting a political or religious message? Precision of regulation is the watchword where free speech issues arise. *Village of Schaumburg v. Citizens For Better Environment*, 444 U.S. 620, 636 (1980) (quoting *NAACP v. Button*, 371 U.S. 415, 438 (1963)); *Roth v. United States Alberts v. State of California*, 354 U.S. 476, 488 (1957). In fact, exactly that point was made in the very first of the modern free speech cases, when Judge Learned Hand observed, "The tradition of English-speaking freedom has depended in no small part upon the merely procedural requirement that the state point with exactness to just that conduct which violates the law." *Masses Pub. Co. v. Patten*, 244 F. 535, 543 (S.D. N.Y. 1917). In attempting to skirt those requirements Defendants would push back free speech jurisprudence to the dark days of World War I when the Supreme Court turned a deaf ear to the petitions of Charles T. Schenck, Jacob Frohwerk, and Eugene Debs. *Schenck v. United States*, 249 U.S. 47 (1919); *Frohwerk v. United States*, 249 U.S. 204 (1919); and *Debs v. United States*, 249 U.S. 211 (1919).

But it is far' too late in the day for such atavisms. Decades of binding precedent stand athwart Defendants desire to misconstrue Georgia Code §§ 16-7-42 and 16-7-43(M). In *Martin v.*

*City of Struthers*, 319 U.S 141 (1943), the municipality had outlawed the distribution of flyers (or "leaflets") in residential areas. *Id.* at 142. The stated reasons for the law were not trivial. The city pointed to not only that the danger of litter (of which concern the Court made short shrift – "The privilege may not be withdrawn even if it creates the minor nuisance for a community of cleaning litter from its streets." *Id., citing Schneider v. State*, 308 U.S. 147, 162 (1939)), but also to the fact that many residents of Struthers worked swing and night shifts in steel mills (with the result that their sleep would doubtless be disturbed by door to door knocking), as well as the fact that unscrupulous persons often posed as evangelists while actually casing homes for burglary. But the Supreme Court would have none of it in light of the countervailing threat to free speech:

> While door to door distributers of literature may be either a nuisance or a blind for criminal activities, they may also be useful members of society engaged in the dissemination of ideas in accordance with the best tradition of free discussion. The widespread use of this method of communication by many groups espousing various causes attests its major importance. 'Pamphlets have proved most effective instruments in the dissemination of opinion. And perhaps the most effective way of bringing them to the notice of individuals is their distribution at the homes of the people.'... Door to door distribution of circulars is essential to the poorly financed causes of little people.
>
> *Id.* at 145 (citations and quotations omitted).

*Martin v. Struthers* was no anomaly. Over fifty years later, the Georgia Supreme Court stood on *Martin v. Struthers* to invalidate the City of Sylvania's ordinance, which had prohibited a commercial publisher from delivering the "Penny-Saver" "without charge to Sylvania city residents by throwing the paper in yards or driveways." *Statesboro Pub. Co. v. City of Sylvania*, 516 S.E.2d 296, 300 (Ga. 1999). The ordinance had been drawn to "deal with the litter caused by unclaimed papers." *Id.*

It is indisputable that Plaintiffs here were "engaged in the dissemination of ideas" (*Martin v. Struthers, supra.*) and as such their activity was clearly protected. Furthermore, it is indisputable

that, even granting Defendants the widest latitude, they are attempting to apply their criminal statute in an overbroad manner at the expense of free speech.

### C. Plaintiffs Clearly Demonstrate First Amendment Retaliation

A First Amendment retaliation claim is demonstrated by three elements. Plaintiffs must show: (1) that their speech was constitutionally protected; (2) that they suffered adverse conduct that would likely deter a person of ordinary firmness from engaging in such speech; and (3) that there was a causal relationship between the adverse conduct and the protected speech. *Castle v. Appalachian Technical Coll.*, 631 F.3d 1194, 1199 (11th Cir. 2011). Plaintiffs here unquestionably demonstrate all three elements.

The distribution of the flyers in question was constitutionally protected speech (to be sure, this inquiry is a matter of law for the Court to decide – *Connick v. Myers*, 461 U.S. 138, 148 n. 7 (1983) – and we do not presume to usurp the judicial function, only to advocate zealously). The flyers at issue raise questions about Jewish influence and actions. Many would vehemently reject their assertions, but they unquestionably "engage in the dissemination of ideas." "[E]very citizen, has a strong interest in having the opportunity to speak his mind, free from government censorship or sanction" (*Waters v. Chaffin*, 684 F.2d 833, 841 (11th Cir. 1982)), especially where they attempt to "engage in the dissemination of ideas." *Martin v. Struthers, supra.*

Unquestionably the flyers relate to matters of public concern because speech is "on matters of public concern" if it relates "to any matter of political, social, or other concern to the community." *Connick v. Myers*, 461 U.S. 138, 146 (1983). As such, Plaintiffs' activity lies very close to the core area protected by the First Amendment. That Plaintiffs chose to express their ideas "in language some might find offensive is not, in and of itself, enough to override [their] interest in speaking freely." *Id.* at 837, *citing, inter alia, Spence v. Washington*, 418 U.S. 405, 412

(1974); *Street v. New York*, 394 U.S. 576, 592 (1969); and *Wiegand v. Seaver*, 504 F.2d 303, 307 (5th Cir. 1974), cert. denied, 421 U.S. 924 (1975). "'Indeed, if it is the speaker's opinion that gives offense, that consequence is a reason for according it constitutional protection.'" *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 55 (1988), quoting *FCC v. Pacifica Foundation*, 438 U.S. 726, 745 (1978). Plaintiffs' speech presented no evil "so imminent" that "it may befall before… opportunity for full discussion." *Whitney v. California*, 274 U.S. 357, 377 (1927) (Brandeis, J., concurring). In 1927, as now, there is time for "the deliberative forces to prevail over the arbitrary" and "the fitting remedy for evil counsels is good ones." *Id.* at 375.

Moreover, in questions of race or religion, the government cannot take sides where speech is concerned because the "exclusion of several views on that problem is just as offensive to the First Amendment as exclusion of only one." *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 831 (1995). After all, "dialogue assumes, in the nature of the case, different points of view'" (*Wieman v. Updegraff*, 344 U.S. 183, 197 (1952) (Frankfurter, J., *concurring*), and freedom of speech "may indeed best serve its high purpose when it induces a condition of unrest… or even stirs people to anger." *Terminiello v. Chicago*, 337 U.S. 1, 4 (1949).

Turning to the second element, there is no doubt that it, too, has been met: "The threat of arrest is the quintessential retaliatory conduct that would deter a person of ordinary firmness from exercising First Amendment rights." *Turner v. Williams*, 65 F.4th 564, 580 (11th Cir. 2023). Plaintiffs Hilary and Phillip Jacobs have been actually arrested, while the threat of arrest continues to hang over Plaintiff Weaver.

The third element is also met. The false affidavits at Defendants' Exhibit A at *RE. 39-2* themselves show that "there was a causal relationship between the adverse conduct and the protected speech" because they tie Plaintiff's flyering to the littering charges — without, of course

revealing the facts that utterly destroy probably cause (as set forth below). "[T]he significance of probable cause or the lack of it looms large" (*Hartman v. Moore*, 547 U.S. 250, 265 (2006)) because "[d]emonstrating that there was no probable cause for the underlying criminal charge will tend to reinforce the retaliation evidence and show that retaliation was the but-for basis for instigating the prosecution, while establishing the existence of probable cause will suggest that prosecution would have occurred even without a retaliatory motive." *Id.* at 261; *see also. Lozman v. City of Riviera Beach*, 138 S.Ct. 1945, 1958 (Thomas, J., *dissenting*).

The burden here shifts to Defendants Catlin, Jean, and Wright ("upon a prima facie showing of retaliatory harm, the burden shifts to the defendant official to demonstrate that even without the impetus to retaliate he would have taken the action complained of," *Hartman v. Moore* at 260, *citing Mt. Healthy City School Dist. Board of Education v. Doyle*, 429 U.S. 274, 287 (1977), *abrogated on other grounds by statute*)). Given that their own affidavits tie the retaliatory conduct to Plaintiffs' flyering (*RE. 39-2*), they cannot meet this burden as a matter of law. This is especially so where an objectively reasonable basis for their actions is patently lacking.

The cases cited in Defendants' motion to dismiss to argue that Defendants can meet their burden by proffering evidence of a mixed or lawful motive are not apposite. *Foy v. Holston*, 94 F.3d 1528 (11th Cir. 1996); *Stanley v. City of Dalton*, 219 F.3d 1290, 1296 (11th Cir. 2000); and *Rioux v. City of Atlanta*, 520 F.3d 1269 (11th Cir. 2008). All derive from *Foy*, which was premised on the fact that "Defendants' conduct was objectively reasonable for the purposes of qualified immunity." *Foy*, 94 F.3d at 1536. Given the materially misleading affidavits sworn by Defendants Catlin, Jean, and Wright, the conduct here was objectively unreasonable and neither *Foy* nor its progeny have any application. Thus, Plaintiffs need not show that the retaliatory animus was the sole motivating factor. On the contrary, it is enough under *Mount Healthy* if the unlawful animus

was "a substantial or motivating factor" in the decision to take adverse action. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. at 287. Given the false affidavits, no lawful motive is even plausible.

Thus we have official reprisal for protected speech. But "Official reprisal for protected speech 'offends the Constitution [because] it threatens to inhibit exercise of the protected right,' and the law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions, including criminal prosecutions, for speaking out." *Hartman v. Moore* at 256, *citing, inter alia, Crawford-El v. Britton*, 523 U.S. 574 (1998).

### D. Plaintiffs Clearly Demonstrate the Right to Declaratory Relief for Overbreadth

The issue here is the overbreadth evident in Defendants' misuse of §§ 16-7-42 and 16-7-43 of the Georgia Criminal Code. A statue suffers from overbreadth if it sweeps too widely into protected speech, even if it aims at activity which is otherwise within the legitimate sphere of regulation. *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973). Plaintiffs deny that they were distributing their colportage on public sstreet and predict that the video evidence referenced at *RE. 39-2* will fail to show that they were ever distributing flyers "on the roadway" or "on sidewalks," as falsely claimed by Defendants Catlin, Jean, and Wright.

But the court need not await the resolution of that factual matter to determine overbreadth here because the phony affidavits indicate that Defendants seek to prosecute Plaintiffs for distributing colportage even onto private property. *RE. 39-2*. That activity is plainly protected under *Martin v. Struthers* and *Statesboro Pub. Co. v. City of Sylvania*. Such being the case, Defendants are manifestly misusing §§16-7-42 and 16-7-43 in an overbroad manner and the statute, if interpreted as Defendants urge, is unconstitutional as applied to the Plaintiffs.

11

*Broadrick*, 413 U.S. at 630 (recognizing that "overbreadth review is a necessary means of preventing a 'chilling effect' on protected expression.").

E. **There Is No Qualified Immunity for Defendants Catlin, Jean, and Wright, Who Swore False Affidavits with Intentionally Misleading Omissions.**

Assessing Qualified Immunity is a two-step inquiry: "an officer is entitled to qualified immunity unless he (1) violated a constitutional right, and (2) that constitutional right was clearly established at the time." *Bradley v. Benton*, 10 F.4th 1232, 1238 (11th Cir. 2021). Moreover, the inquiry uses an objective standard, *viz.* "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 33 U.S. 192, 202 (2001). Thus, the question does not probe Plaintiffs' subjective intentions as in the inapt framing of Defendants' Motion to Dismiss at *RE 39-1, p. 14*, viz. "Plaintiffs' subjective intentions as to whether they believed what they were doing constituted littering or whether it actually constituted littering." Nor does the question even probe the subjective intentions of Defendants Catlin, Jean, and Wright. The question is whether a reasonable officer, having investigated and collected "approximately 109 Ziploc baggies which consistently contained the same type of political, cultural, and religious flyers as found in Exhibits 1 and 2" on November 2, 2023, Am. Compl. ¶ 33, would have reasonably believed such material was mere litter, as opposed to colportage. It is respectfully submitted no reasonable officer could have made such a mistake.

Under *Martin v. Struthers* and *Statesboro Pub. Co. v. City of Sylvania*, the Plaintiffs clearly have a right to distribute colportage in Lithia Springs and everywhere else in Georgia. And that right was clearly established on November 2, 2023 – *Statesboro Pub. Co.* had already been on the books for over two decades, while *Martin v. Struthers* dates from World War II.

"The ordinary way of showing that a right is clearly established is by showing that 'a materially similar case has already been decided.'" *Bradley v. Benton* at 1244, *quoting Mercado v. City of Orlando*, 407 F.3d 1152, 1159 (11th Cir. 2005), *citing in turn Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Prior decisions from the Supreme Court, the Eleventh Circuit, or the relevant state supreme court are those that "put officers on notice regarding the constitutionality of their actions." *Id.* at 1242-1243, *citing Crocker v. Beatty*, 995 F.3d 1232, 1240 (11th Cir. 2021). Thus, *Martin v. Struthers* and *Statesboro Pub. Co. v. City of Sylvania* suffice here.

An alternative way of piercing Qualified Immunity is by the separate two-step process set forth in *Sylvester v. Fulton Cnty. Jail*, 94 F.4th 1324, 1329-30 (11th Cir. 2024). Plaintiffs "must first explain how any inaccuracies were material, i.e., 'necessary to support the warrant.'" *Id.* at 1329. If the omissions, once supplied, defeat probable cause, Plaintiffs proceed to the next step, which asks if there "is evidence in the record that would allow a reasonable jury to find that the inaccuracies in the affidavit did not result from a 'reasonable mistake' but stemmed from intentional or reckless deception." *Id.* at 1330. And again the inquiry is objective – hence the stress on a *reasonable mistake*.

Again, Plaintiffs meet both prongs. All fifteen of the affidavits found in the warrants at Defendants' Motion to Dismiss exhibits at *RE. 39-2* are "plagued by material misstatements or omissions." *Id.* Every single one of the affidavits omits the fact that the "paper" in question was in fact a flyer which contained a consistent political, cultural, and religious theme and evinced the deliberate attempt to communicate a message. Once that fact is grasped, it is no longer possible to honestly construe the flyers as "discarded or abandoned" "refuse, rubbish, junk, or other waste material" under Georgia's statute because no reasonable officer would imagine that what he was confronted with was mere litter as defined under Georgia Code §16-7-42(M). Had Defendants

Catlin, Jean, and Wright accurately described the flyers in question, they would have needed to explain to a judge how their affidavits could be squared with decades old precedent, which shows that the omissions were material. And notably, these difficulties were readily apparent to other police authorities in Georgia such as the Dunwoody (Georgia) Police on or about February 16, 2023. Am. Compl. at ¶¶ 25, 26; *Jacobs Aff.* at ¶ 2.

With the first prong out of the way, the question becomes whether there is record evidence that Defendants Catlin, Jean, and Wright had facts at their disposal showing their error. *Sylvester v. Fulton Cnty. Jail*, 94 F.4th at 1330. And like Detective Barnett in *Sylvester v. Fulton Cnty. Jail*, they did. Specifically, they had at least 109 baggies worth of evidence — at least 109 flyers with a consistent message — which were collected on November 2, 2023. Am. Compl. at ¶ 33.

As in *Sylvester v. Fulton Cnty. Jail*, Plaintiffs have checked both boxes which "overcomes qualified immunity because [the 11th Circuit has] previously held that any officer who intentionally or recklessly submits an affidavit plagued by material misstatements or omissions violates clearly established law." *Id.* at 1330, citing *Butler v. Smith*, 85 F.4th 1102, 1112 (11th Cir. 2023) and *Paez v. Mulvey*, 915 F.3d 1276, 1287 (11th Cir. 2019).

F. **Abstention Is Not Required or Appropriate**

The Defendants urge this Court to abstain from adjudicating this case under *Younger* abstention doctrine. Abstention, however, is neither required nor appropriate.

As the Eleventh Circuit explained in *Tokyo Gwinnett, LLC v. Gwinnett County, Georgia*, 940 F.3d 1254, 1267-68 (11th Cir. 2019):

> "Abstention from the exercise of federal jurisdiction is the exception, not the rule." *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 813 . . . (1976). In

fact, "federal courts have a virtually unflagging obligation to exercise their jurisdiction except in those extraordinary circumstances where the order to the parties to repair to the State court would clearly serve an important countervailing interest." *Deakins v. Monaghan*, 484 U.S. 193, 203 . . . (1988) . Thus, . . . "[o]nly the clearest of justifications merits abstention." *Jackson-Platts v. Gen. Elec., Capital Corp.*, 727 F.3d 1127, 1140 (11th Cir. 2013) . . . *see also New Orleans Pub. Serv., Inc., v. Council of New Orleans*, 491 U.S. 350, 358-59 . . . . (1989)(noting "federal courts lack the authority to abstain from the exercise of jurisdiction that has been conferred" except with respect to the "carefully defined" areas in which "abstention is permissible" (quotation marks omitted)).

The Eleventh Circuit in *Tokyo Gwinnett* then continued:

> *Younger* doctrine "requires a federal court to abstain where a plaintiff's federal claims could be adjudicated in a pending state judicial proceeding." *Deakins*, 484 U.S. at 202. This doctrine rests on notions of federalism and comity and the desire to avoid duplicative proceedings. *See Younger*, 401 U.S. at 43-45 . . . But the Supreme Court and this Court have recognized that " 'Our Federalism' 'does not mean blind deference to States' Rights,' but instead a 'system in which there is sensitivity to the legitimate interests of both State and National Governments.'" *For Your Eyes Alone, Inc. v. City of Columbus*, 281 F.3d 1209, 1217 (11th Cir. 2002) (quoting *Younger*, 401 U.S. at 44) For that reason, even when a federal case implicates important state interests, "federal courts ordinarily should entertain and resolve on the merits an action within the scope of a jurisdictional grant, and should not refuse to decide a case in deference to the States." *Sprint Commc'ns*, 571 U.S. at 73 (alteration adopted and quotation marks omitted).

The court then further explained:

> *Younger* abstention applies only in three "exceptional circumstances": (1) "ongoing state criminal prosecutions," (2) "certain civil enforcement proceedings," and (3) "civil proceedings involving certain orders uniquely in furtherance of the state courts' ability to perform their judicial functions." *Id.* at 78 . . . When one of those circumstances exists, a court must consider the conditions set out in *Middlesex County Ethics Committee v. Garden State Bar Ass'n*, 457 U.S. 423 (1982, to determine whether abstention was warranted. The three *Middlesex* factors are whether: (1) there is an "ongoing" state-court proceeding at

15

the time of the federal action; (2) the state proceeding implicates an important state interest; and (3) the state proceeding affords the federal plaintiff an adequate opportunity for judicial review of his or her federal constitutional claims. *Id.* at 432; *see For Your Eyes Alone*, Inc., 281 F.3d at 1217.

Finally the court concluded:

> Under this Court's precedent, a state proceeding is considered "ongoing" for *Younger* purposes in two circumstances. First, a state proceeding is "ongoing" if it was pending at the time the federal suit was filed. *See Jones v. Wade*, 479 F.2d 1176, 1181 n.6 (5th Cir. 1973) ("The only relevant inquiry is whether state prosecution was pending at the time Jones brought suit in federal court."). Second, even if a state proceeding began after the filing of a federal suit, the state proceeding is still "ongoing" if "the state [proceeding] commenced before any proceedings of substance on the merits have taken place in the federal court." *For Your Eyes Alone, Inc.*, 281 F.3d at 1217 (quotation marks omitted). In other words, this second circumstance permits a federal court to abstain under *Younger* if "the federal litigation is in an embryonic stage and no contested matter has been decided." *Id.* (alterations adopted and quotation marks omitted). , , , . In contrast with our dissenting colleague, we conclude the state court proceedings were not ongoing when Tokyo Valentino's federal action was filed.

The application of these principles to the present case is straightforward. As to plaintiff Michael Weaver, there is no pending state action. In accordance with *Tokyo Gwinnett* and other cases, including the Supreme Court's decision in *Steffel v. Thompson*, 415 U.S. 452 (1974) (abstention is not appropriate when the plaintiff is threatened with prosecution under an unconstitutional statute, even if the prosecution were not in bad faith), there is no basis whatever for abstention.

The application of abstention principles to Mr. and Mrs. Jacobs also compels the conclusion that abstention is not appropriate. In accordance with *Tokyo Gwinnett*, the analysis here involves a comparison of proceedings in the state court versus those in the federal court. This comparison weighs heavily against abstention. After -- by design -- keeping the Jacobs in legal limbo for over 18 months, the government finally on May 21, 2025 indicated it would be moving forward with an arraignment-- but not until Christmas Eve, December 24, 2025, a

date that should be added to the evidence of the government's bad faith in this prosecution. Quite recently (apparently within the last ten days) the government has moved the arraignment forward to July 29, 2025. By contrast, Plaintiffs' complaint and amended complaint in this case and the Defendants' motion to dismiss have substantially moved the federal case forward, creating a framework for fully addressing the complex but critically important First Amendment issues, nearly all of which are based on Supreme Court and other federal court precedents, that this case presents.

In any event, *Younger* abstention is subject to exceptions, all of which fully apply here. These exceptions are sometimes characterized as three in number, *see, e.g., Redner v. Citrus County, Florida*, 919 F.2d 646, 648 (11th Cir. 1991) (recognized exceptions are for bad faith, harassment, or a patently invalid statue) and sometimes as two, *e.g., Leonard v. Alabama State Board of Pharmacy*, 61 F.4th 902, 911 (11th Cir. 2023) (exceptions have crystalized into two broad categories, proceedings instituted in bad faith and proceedings founded on flagrantly and patently unconstitutional laws). Under either categorization, this case fully satisfies them all.

The Plaintiffs have presented compelling factual allegations supported by affidavits that the Defendants' motivation and purpose in prosecuting or threatening to prosecute the plaintiffs for littering was in bad faith, i.e., their true purpose was to harass the Plaintiffs and prevent them from exercising their First Amendment right to distribute literature. This bad faith was shown among other ways by the Defendants' disingenuous and completely unsupported invocation of the Georgia littering statute; by the now nearly two-year delay in proceeding with the bogus prosecution against the Jacobs; by the deliberate misstatements on the warrants that the flyers constituted littering and that they were thrown on public streets; and by Sheriff Matt Gray's acknowledgment in the newscast interview that his office was focused on the viewpoint and content of the flyers.

Focusing specifically on the Defendants' interpretation of the Georgia littering statute – itself a factor in showing Defendants' bad faith – this interpretation seeking to encompass littering is "flagrantly and patently unconstitutional." As even the most elementary statutory analysis of the Georgia littering statute, Sections 16-7-42 and 16-7-43, makes manifest, the flyers distributed by the defendants were not "litter" within the purview of that statute. This

conclusion is corroborated by the Georgia Supreme Court's decision in *Statesboro Publishing Co., Inc. v. City of Sylvania*, 271 Ga. 92, 516 S.E.2d 296 (1999).

The flyers distributed by the Jacobs do not come close to meeting the statutory definition of "litter" or any commonly understood definition of the term. The rules of statutory construction forbid a subtle or forced construction for the purposes of either limiting or extending a statute's operation or reaching absurd results. *Sliney v. State*, 260 Ga. 167, 168, 391 S.E.2d 114, 115 (1990). Statutes should be read according to the natural and most obvious import of their language. *Choicepoint Services, Inc. v. Graham*, 305 Ga. App. 254, 699 S.E.2d 452, 455 (2010). Moreover, "a penal statute must always be interpreted strictly against the State and in favor of human liberty." *State v. Crumpton*, 369 Ga. App. 403, 893 S.E.2d 816, 820 (2023).

The flyers were not "discarded" or "abandoned"; to the contrary, they were intentionally distributed into residential yards with the hope they would be read. The flyers were not "refuse, rubbish, junk, or other waste material"; to the contrary, they were carefully prepared documents meant to influence public opinion. If basic principles of free speech are to be respected, as they must be, the Plaintiffs' flyers are no more "refuse, rubbish, junk, or other waste material" than other flyers, leaflets, or pamphlets that communicate a political or even a commercial message.

Respectfully submitted,

/s/

Charles Randall Sheppard, Esq.

P. O. Box 1697

Evans, GA 30809

Georgia State Bar Number 641938

/s/

Glen K. Allen, Esq.

5423 Springlake Way

Baltimore, MD 21212

(Pro hac vice application pending)

## CERTIFICATE OF SERVICE

I hereby certify that on this 14th day of July, 2025, true copies of the foregoing were sent to Defendants' Counsel via Electronic Service in accordance with PACER procedures.

/s/

Charles Randall Sheppard, Esq.

P. O. Box 1697

Evans, GA 30809

Georgia State Bar Number 641938

/s/

Glen K. Allen, Esq.

5423 Springlake Way

Baltimore, MD 21212

(Pro hac vice application pending)